IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 7, 2016

**JAMES DANIEL VAUGHN v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Henderson County**
**No. 10105-1      Roy B. Morgan, Jr., Judge**

**No. W2015-01536-CCA-R3-PC  -  Filed August 26, 2016**

The petitioner, James Daniel Vaughn, appeals the denial of his petition for post-conviction relief arguing he received ineffective assistance of counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined. J. ROSS DYER, J., not participating.

Michael Thorne, Lexington, Tennessee, for the appellant, James Daniel Vaughn.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Angela R. Scott, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted of second degree murder and three counts of reckless endangerment with a deadly weapon. He was sentenced to twenty years for his second degree murder conviction and two years for each reckless endangerment conviction, to be served concurrently, for an effective sentence of twenty years in the Department of Correction. His convictions were affirmed by this court on direct appeal, and he did not file an application for permission to appeal to the supreme court. State v. James Daniel Vaughn, No. W2012-01728-CCA-R3-CD, 2013 WL 3807989, at *1 (Tenn. Crim. App. July 17, 2013).

This court recited the underlying facts of the case on direct appeal as follows:

Tammy Renee Middleton, the [petitioner]'s ex-wife, testified that she was married to the [petitioner] approximately thirty days. The two of them divorced, and, as part of their settlement, Middleton paid money to the [petitioner] for a vehicle on April 30, 2011.[1] Her divorce attorney was to deliver the money to the [petitioner].

On cross-examination, Middleton denied knowing during the course of their relationship that the [petitioner] used drugs, although she "had suspicions." She was not aware that the [petitioner] moved in with a "Ms. Cohen" before their divorce was final. She acknowledged that she married the [petitioner] before her divorce was final with a man named Rocky Smith. However, she stated that she entered into the marriage with the [petitioner] "out of fear of death of me or my daughter. I was threatened by him."

Nakia Lewis, a general manager at Burger King, testified that Sean Cohen ("the victim") was an employee there in 2010. She identified records indicating that the victim reported to work on May 1, 2010, at 1:57 p.m. and left just after 8:00 p.m. On cross-examination, Lewis was surprised to learn that the deceased victim had tested positive for marijuana and alcohol.

Atia White Cohen, the victim's sister, testified that she had been dating the [petitioner] for approximately one month prior to the victim's death. During the time that Atia[2] dated the [petitioner], she lived with the victim; the victim's girlfriend, Candace Jowers; and the victim's two children.[3] At some point, the victim allowed the [petitioner] to live with them as well because he was not working. She denied ever witnessing the victim engage in drug activity of any kind, although she acknowledged that he had been convicted of a drug offense in the past.

---

[1]Although Middleton testified that this event occurred on April 30, 2011, it is apparent from the record that she meant April 30, 2010.

[2]Because some witnesses share a common surname, we will use their given names. We intend no disrespect.

[3]Atia testified that the victim's younger child was two weeks old at the time of the victim's death.

On April 30, 2010, Atia accompanied the [petitioner] to an attorney's office to retrieve some money. They returned to the house of her sister, Akita Cohen, and the [petitioner] then left with another man and returned with "some Xanax pills and some cocaine." Atia denied seeing a gun on the [petitioner]. She and the [petitioner] spent that evening at the victim's house, and, the next morning, they returned to Akita's house. At some point, the [petitioner] "opened a can of biscuits. . . . Well when the biscuits got done, he threw the pan in the sink real hard and real loud and my sister told him, 'Don't do that.'" Atia stated that this encounter erupted into the [petitioner] "talking crazy like [he] called [Akita] a b* * *h and told her she can't tell him what the f* *k to do, you know." Sometime thereafter, Atia and the [petitioner] returned to the victim's house.

Later in the day, Akita called Atia and told her that, in light of the incident that morning, the victim did not want the [petitioner] to stay with them anymore. Furthermore, he wanted the [petitioner] gone by the time he returned home from work that evening. Atia relayed this information to the [petitioner], and "he got mad and decided he wanted to fight, he wanted to pick a fight." The [petitioner] left, and, at approximately 8:00 p.m., he returned to the victim's house and got into an argument with Atia.

According to Atia, the [petitioner] left once again and returned at approximately 11:00 p.m. The [petitioner] woke her up and asked her whether she thought the victim would reconsider making him leave. When she told him "no" and that she did not see them staying "together," "he got mad and he showed [her] a gun." He then pointed the gun at her and told her to get out of the bed and to call the victim. She complied and handed him the phone. She heard the [petitioner] say to the victim, "'B* * *h, you want me to leave your house[.]' . . . [T]hen he started beating the gun against the side of the house and he was like, 'B* * * h, you hear this. You hear this, b* * *h? . . . Come make me leave. Come make me leave.'" At that point, the [petitioner] left the house with the house phone and his gun.

Atia stayed in the house and, at some point thereafter, she heard two gunshots. She did not see what happened and stayed in the house until she heard Akita and Jowers screaming. Atia then ran toward a vehicle down the street and observed the victim in the driver's seat and noticed that "his tongue was hanging out of his mouth."

On cross-examination, Atia acknowledged using some of the [petitioner]'s cocaine on the evening of April 30, 2010. She denied that the

3

victim possessed a gun or that she locked the [petitioner] in the bedroom on the night of the shooting. Atia acknowledged that she was out of state at the time of the preliminary hearing and in violation of her probation at that time for possession of drug paraphernalia.

Akita Shontelle White Cohen, another sister of the victim and twin sisters with Atia, testified that the [petitioner] arrived at her residence at approximately 9:00 to 10:00 a.m. on May 1, 2010. She continued, "We were just sitting around . . . while we were making breakfast, and then I . . . went to my room to attend to the baby, and I heard a big bang in the kitchen, and that's when I went back to the front and told him he was making too much noise, to calm it down." At that point, the [petitioner] "started calling me [sic] out my name and start[ed] saying all kind of stuff to me, threw my biscuits in the trash." Accordingly, Akita stated that she asked him to leave but that the [petitioner] "was arguing and fighting with me, trying to run up in my face and stuff, and I went over to my neighbors and told her and asked her can I use her phone to call the police." Before Akita called the police, however, the [petitioner] left, and she did not see him until later that afternoon. When she next saw the [petitioner], he "flagged [her] down and told [her] that he was sorry about earlier."

Akita testified that when the victim finished his shift at Burger King at approximately 8:00 p.m., he went to her residence. She had explained to the victim about the incident that morning, and the victim told her that he no longer wanted the [petitioner] to live with him. Accordingly, Akita called Atia and told her "that [the victim] said [the petitioner] had to go." Akita spoke with the [petitioner] over the phone at approximately 10:00 p.m. To her knowledge, the [petitioner] had not spoken to the victim at that point. Later, the [petitioner] called the victim's cell phone, and she "just heard [the victim] saying that [the petitioner] had to go, and then [she] heard [the victim] say, 'Well I'm on my way over there.'" She described the victim's demeanor at that time as "a little upset but not raging mad." Akita denied hearing the victim threaten the [petitioner] or ever seeing the victim with a weapon. Within approximately three to five minutes of this phone call, she got in a vehicle with the victim, Jowers, and the victim and Jowers' infant[4] to drive to the victim's residence.

_____

[4]The indictment lists the three victims of the reckless endangerment as Akita, Jowers, and Akita's infant. However, the proof established at trial that the infant in the vehicle was the child of Jowers and the victim.

4

Once they turned onto the street of the victim's residence, Akita observed the [petitioner] "walking toward[] the car with his hand like on his belt area." The victim stopped the vehicle because the [petitioner] was in the middle of the road. She did not see his gun until he "started hitting on the window with it." Akita did not remember the [petitioner] or the victim saying anything while the [petitioner] hit the window. Next, the [petitioner] walked to the driver's side of the vehicle, and the victim opened his door. Akita agreed that the victim was approximately six feet, three inches and 380 pounds. She stated that, in order to get out of his vehicle, the victim routinely held the steering wheel to support himself. Thus, when the victim opened the door, he held the steering wheel to support himself and placed one foot outside the vehicle. Right at that time, however, the [petitioner] shot him. She never saw the victim stand up out of the vehicle. Akita could not recall how many gunshots she heard, although she confirmed stating in a previous statement that she heard three gunshots.

As soon as she heard the gunshots, Akita put her head down. During this incident, Jowers was screaming, and the [petitioner] "was waving his gun in the car. He was like, 'Shut up. Shut up.'" Once the [petitioner] fled, she told Jowers to get out of the car. She did not see the [petitioner] again until she later saw the police apprehend him.

Akita remembered that, as soon as the victim was shot, he said, "Oh, I been shot. Baby, call the police," and that she never heard him say anything else. Jowers called the police to report the shooting. Akita believed that the victim still was breathing when others responded to the scene to help. A man named Melvin Teague helped prop the victim up in his seat until emergency personnel arrived.

Akita confirmed that she observed the [petitioner] take "some Xanaxes" at her residence that morning but denied seeing the [petitioner] with any other drugs. On cross-examination, she also denied having any awareness that Atia had used drugs that morning. She further denied observing the victim drink alcohol or smoke marijuana on the evening of the shooting. To Akita's knowledge, the victim did not possess a gun.

On further cross-examination, Akita acknowledged her testimony from the preliminary hearing that, when the victim left her residence to confront the [petitioner] at the victim's residence, she "thought that they were probably going to end up fighting." She also confirmed that, when the [petitioner] began hitting the back passenger window, she became

scared and asked the victim to drive away. According to Akita, she never heard the [petitioner] or victim say anything to each other during this incident.

Akita acknowledged that a police station was only a couple of blocks away but that the victim decided to confront the [petitioner] rather than go to the police. She could not explain why the victim attempted to get out of the vehicle. She stated that, after the shooting occurred, "a lot of people" had access to the vehicle prior to the police officers' arrival.

Candace Nicole Jowers testified that the victim was the father of her children and that, prior to his death, she had been in a relationship with him for approximately five years. Jowers confirmed that the [petitioner] was living with them for free. She never observed the [petitioner] or the victim deal drugs. On the day of the shooting, she spent the morning at her shared residence with the victim and then took the victim to work at Burger King shortly before 2:00 p.m. Jowers next went to Akita's residence, so she did not see the [petitioner] at all during the day. During the victim's break at work, she and Akita went to Burger King to tell him about the altercation that had occurred at Akita's residence earlier in the day. At that time, the victim indicated that he wanted the [petitioner] to leave his residence. She picked up the victim after his shift and then returned to Akita's apartment. Jowers did not recall the victim having a beer or using drugs there. At some point, the [petitioner] called the victim, and Jowers "heard [the petitioner] call [the victim] a b* * *h." Jowers recalled that it sounded as though the [petitioner] was "breaking items in [her] house" and that "[h]e sounded very furious and angry."

About twenty minutes after speaking with the [petitioner] on the phone, the victim, Jowers, Jowers' infant, and Akita left to drive to the victim's residence. As they turned onto the street of the residence, Jowers observed the [petitioner] on the right side of the street with their house phone in his back pocket and "something . . . in the front of his pants." Eventually, the [petitioner] walked behind the car to the driver's side and tapped on the victim's window with his gun. No one said anything to the [petitioner] while he was hitting the windows. Jowers called out her infant's name, and the victim said, "I got to get out." Then, the victim "goes to open the door, starts to put his feet out of the door, and [Jowers] heard a gunshot." In total, she heard two gunshots. At that point, she "put [her] hands over [her] face and started praying." She continued, "I was very scared. I was afraid to call 911. I had my cell phone in my hand, but I

was afraid to call 911 because I was afraid that he would shoot me. So I sat there with my hands on my face."

The [petitioner] eventually walked away from the rear of the vehicle toward the intersection. Once Akita told her that the [petitioner] was gone, Jowers called 911 on her cell phone. She never heard the victim say anything after he was shot.

On cross-examination, Jowers stated that she first observed the victim use marijuana early in their dating relationship. She was not aware that the victim had marijuana and alcohol in his system at the time of his death. Jowers stated that she accompanied the victim with their infant to confront the [petitioner] because the victim "was not furious enough that he was going to hurt anyone." She confirmed that the victim had called their landlord to inform him that they were asking the [petitioner] to leave, but she denied knowing that the landlord had instructed the victim to "[g]et the law to help."

Defense counsel asked Jowers why the victim did not contact police when he realized that the [petitioner] had a gun, rather than trying to step out of the car. Jowers responded, "Sir, at that point it was too late when someone is standing there with a gun."

Mandy Maness, a neighbor of the victim, testified that, approximately two to three months before the shooting, she allowed the [petitioner] to stay with her for a few weeks after he got out of jail. After leaving her residence, the [petitioner] moved in "a couple of houses down with his girlfriend, [At]ia."

On the night of May 1, 2010, she recalled that it was raining so hard that it was flooding. She first saw the [petitioner] at approximately 8:00 to 9:00 p.m. when he was at her residence "throwing marijuana all over the floor, . . . and . . . [she] could see the pistol. He had a pistol tucked into . . . the right side of his pants, and his words were kind of slurred." She and her boyfriend, Fletcher Howard, asked him to leave, and the [petitioner] "got ill about it but he went ahead and left." At approximately 11:40 p.m., she and Howard were sitting on her front porch smoking cigarettes. Maness observed the [petitioner] walk past their residence while talking on a "house phone" with a gun in his hand. She noted that he was on the side of the road walking away from the victim's residence.

According to Maness, right as the [petitioner] approached the end of the street, the victim's vehicle turned onto the street. The [petitioner] "walked like he was going to walk up to the passenger side door, but he went ahead and went around the back of the car and came to the driver's side." She could hear him screaming but could not remember at trial what he was saying. The [petitioner] still had the gun in his hand and banged the driver's side window with it. Maness stated, "And then I saw the driver's side door open just a few inches, and then I heard gunshots." She remembered hearing two gunshots and saw "a flash of fire or something." This incident occurred in front of the lot right next to her residence, so she saw all of it "very clearly." Immediately, Maness ran toward the vehicle as the [petitioner] walked down another street. Maness took the infant out of the vehicle and kept her while Jowers was at the hospital with the victim.

On cross-examination, Maness acknowledged that she had been convicted of criminal conspiracy to commit forgery, forgery, disorderly conduct, shoplifting, domestic assault, and theft. She denied, however, receiving any money from the victim to assist with her bonds related to those charges.

Maness did not observe the victim attempt to get out of the vehicle but only saw the door open. On redirect examination, Maness stated that the [petitioner], prior to seeing the victim's vehicle, had "tucked [the gun] into his pants" because a police car drove by. Once the victim drove up, the [petitioner] retrieved his gun from his pants.

Wayne Faulkner testified that he was the landlord for the victim and Jowers at the time of the shooting. On the night of the shooting, the victim called Faulkner and told him, "I'm going to get this boy out of my house." Faulkner responded to the victim that "he needed to take the law with him when he went." He confirmed that he also told the victim that "he could do whatever he wanted to because it was his house." Faulkner recalled that the victim seemed calm over the phone.

Fletcher Calvin Howard, Jr., testified that he had known the victim since childhood and that they were first cousins. On the night of the victim's death, he was living with Maness and home with her that evening. He had seen the [petitioner] earlier in the day when the [petitioner] came to their residence to ask for a ride somewhere. They told the [petitioner] that they could not give him a ride, and the [petitioner] left. Later that evening, at approximately 11:40 p.m., Howard and Maness were sitting on their

front porch smoking cigarettes when they observed the [petitioner] "walking up the street with a house phone in his hand and a gun in his other hand." Howard then saw the victim's car drive onto the street and stop when the [petitioner] was beside the passenger's side of the vehicle. The [petitioner] walked to the driver's side of the vehicle and knocked on the window with his gun. The victim opened his door, and the [petitioner] "reached in and shot him twice." Immediately after hearing the gunshots, Howard called 911. The [petitioner] walked up another street out of sight, and Howard approached the vehicle. Howard recalled that the victim "was laying lifeless in the front seat." A neighbor, Melvin Teague, was already in the front seat with the victim attempting to administer CPR.

On cross-examination, Howard denied hearing the [petitioner] say anything when he approached the victim's vehicle. He also denied ever having bought drugs from the victim. He acknowledged, however, that he previously had been convicted of possession of a Schedule IV controlled substance. He also acknowledged making a previous statement that, when the [petitioner] approached the victim's vehicle, the [petitioner] "had a few words" with the victim. He explained that he could not hear what was said. Howard recalled that he observed a gunshot wound on the victim's left shoulder below the collarbone.

Mark Hayes testified that on May 1, 2010, he was employed as a paramedic in Henderson County. He was called to the scene of the shooting and arrived at approximately 11:50 p.m. Upon arriving, he found the victim "sitting in the driver's seat of the car slumped over . . . toward the passenger side." The victim was "unresponsive" and not breathing at that time, but Hayes confirmed that the victim had a pulse. Hayes continued,

> We got the patient out. . . . I went and reassessed him again right quick. He wasn't breathing, and I intubated him, took over his breathing for him, and we got him packaged real quick and saw it was a dire situation, so we got en route as soon as we could.

Hayes observed two gunshot wounds to the victim's left arm.

Patrolman Kevin Bruce Wise with the Lexington Police Department ("LPD") testified that on May 1, 2010, he was the first officer to respond to the scene. When he arrived, he observed the victim "inside a vehicle . . . in

9

the driver's seat slumped over on the passenger side." No other people were in the vehicle at that time. He noticed that the victim had a wound on the left side of his shoulder and did not appear to be breathing. Accordingly, Patrolman Wise called Emergency Medical Services ("EMS") and was present when EMS arrived.

Patrolman Wise stated that Howard was the first individual to approach him, and Howard informed him that "the suspect that had shot the victim had run down Holly Street." He then advised another officer regarding the suspect's description and last seen whereabouts. Atia next approached Patrolman Wise and informed him that the suspect was her boyfriend. At some point thereafter, an individual "pointed down the street and said, 'I believe that's him there,'" indicating that it was the [petitioner]. The [petitioner] was moving "at a brisk pace" as he crossed the street several houses away and entered a residence. Patrolman Wise and another officer later entered that residence and observed "wet, muddy footprints." They, however, did not find the [petitioner] or anyone else inside the residence. As they exited the residence, they observed other officers arresting an individual who identified himself as the [petitioner]. During the course of that arrest, a pat down search revealed a firearm on the [petitioner]. The [petitioner] was asking for his girlfriend and stated that he did not mean to shoot the victim. On the way to the Henderson County Jail, the [petitioner] "was making extreme utterances," but Patrolman Wise was unable to understand most of what the [petitioner] said.

Sergeant Mark Wood with the Henderson County Sheriff's Department testified that on May 1, 2010, he was employed with the LPD. When he arrived at the scene of the shooting, Patrolman Wise informed him of where the suspect had fled. Sergeant Wood called for assistance from the county. He accompanied Patrolman Wise to a residence and then heard other officers apprehending an individual he identified at trial as the [petitioner]. He recalled that the officers retrieved a handgun from the [petitioner]'s "left pants boot area." After the [petitioner] was placed under arrest, Sergeant Wood photographed the gun and the [petitioner]. Later, Sergeant Wood took a written statement from Atia at the police station. He then went to the hospital at approximately 2:00 to 2:30 a.m., and, while he was there, the victim was pronounced dead.

On cross-examination, Sergeant Wood acknowledged that the residence he and Patrolman Wise entered was the victim's residence. He

10

recalled that, in addition to muddy tracks, he observed "clothes scattered about the floor."

Officer Brad Reeves with the Henderson County Sheriff's Department testified that he arrived at the scene of the shooting at approximately 12:30 to 12:45 a.m. on May 2, 2010. He and Investigator Kenneth Thompson went to assist two other officers who were searching a residence. Before they reached the residence, however, he observed what he thought was "somebody peeking around the corner" of some vacant house. He began looking around the house until he saw "the silhouette of a person." Officer Reeves continued,

> Then I started demanding, "Let me see your hands," you know, "Come off the porch," and, you know, "what are you doing there," and about the time he started stepping off the porch, that's when I noticed his pants was [sic] wet. So I'd radioed in. I said, "I got a suspect over here." I said, "I don't know it's the one we're looking for, but I got one." And when I seen his pants wet, it kind of alarmed me. Then he started hollering, "Reeves, it's me. Reeves, it's me."

Officer Reeves confirmed that he had had prior contact with this individual, whom he identified at trial as the [petitioner]. The [petitioner] told Officer Reeves that he "messed up" and motioned to something on his leg. When Officer Reeves tried to take the [petitioner] into custody, the [petitioner] "broke and r[a]n." Officer Reeves chased him and eventually apprehended him "at gunpoint" on the ground, with backup arriving around this time. He believed that the [petitioner] lost his balance because the ground was wet from the storm. Officer Reeves warned the other officers, "The gun's on his leg. It's on his leg. Y'all be careful." Investigator Thompson used a taser on the [petitioner], and a handgun was recovered from the [petitioner]'s left leg.

Deputy Jeremy Jackson with the Henderson County Sheriff's Department testified that, when he arrived at the scene, he observed Officer Reeves talking with and then chasing after the [petitioner]. By the time Deputy Jackson caught up with them, "Investigator Thompson had already tased the gentleman." Deputy Jackson helped handcuff the [petitioner] and proceeded to search him. During the search, he obtained "a semi-automatic black in color weapon" from the [petitioner]'s left leg. Another officer

11

instructed him to drop the gun, so Deputy Jackson complied and left the gun there on the ground.

Investigator Kenneth Dewayne Thompson with the Henderson County Sheriff's Department testified that he arrived on the scene of the shooting with Deputy Reeves. Deputy Reeves heard a noise, and Investigator Thompson followed him to survey the area. Investigator Thompson had walked around the other side of a house from Deputy Reeves, and soon after he observed a man running. This man was identified at trial as the [petitioner]. Investigator Thompson began chasing the [petitioner], and the [petitioner] eventually "stumbled to a[sic] front and fell face first into the ground." The officers instructed the [petitioner] to "get his hands up," but the [petitioner] resisted, so Investigator Thompson eventually used a taser on him.

Deputy John James with the Henderson County Sheriff's Department testified that on May 2, 2010, he served as a corrections officer at the jail where the [petitioner] was transported. While in his cell, the [petitioner] began "rattling the cell door" and asking for a more experienced corrections officer. When Deputy James told the [petitioner] that there was no one else, the [petitioner] threatened to beat him up. The [petitioner] eventually calmed down and requested to make a phone call, which Deputy James denied, given that the [petitioner] was under investigation. Later in the day, the [petitioner] asked Deputy James whether the victim had died.

Investigator Scottie Kizer with the LPD testified that he arrived at the scene of the shooting at approximately 12:18 a.m. on May 2, 2010. The [petitioner] was already in custody when he arrived. Investigator Kizer identified at trial photographs that he took at the scene. One of the pictures depicted the handgun found on the [petitioner], which he described as a "Keltec," a nine millimeter, semi-automatic weapon. He stated that the particular cartridge in the handgun would hold ten bullets and that two bullets were still in the magazine when recovered.

Investigator Kizer requested that the victim's vehicle be towed to the LPD, and then he went from the scene to the emergency room. Upon arriving, he learned that the victim had died. According to the medical examiner's records, the victim died at approximately 12:58 a.m. from gunshot wounds. Investigator Kizer photographed the victim at the hospital and identified photographs at trial of the victim's wounds and his hands. He explained the importance of looking at a victim's hands to determine

12

whether the victim "was in an altercation." He confirmed that the victim had no injuries or marks on his hands.

Investigator Kizer discussed a forensic report admitted into evidence. In this report, both bullets found within the victim were determined to have been fired from the same weapon. Additionally, gunshot residue was found on the victim's t-shirt, and the report indicated that the weapon was within two feet of the victim when the shots were fired.

On cross-examination, Investigator Kizer denied that anyone other than law enforcement was near the victim's vehicle when he arrived at the scene. He identified affidavits of Jowers and Akita stating that, when the victim opened the vehicle door, the [petitioner] fired three shots, hitting the victim twice. He confirmed, however, that he never found a third casing or a third bullet hole. Jowers requested to retrieve her cordless house phone, and Investigator Kizer eventually returned it to her.

Investigator Kizer agreed that a page in the medical examiner's report stated, "Decedent shot twice left shoulder after arguments with the alleged . . . assailant. Resuscitation efforts not effective." He acknowledged that, although the [petitioner] was charged with reckless endangerment with a deadly weapon as to the three other passengers in the vehicle, "there was no pointing a gun at them, or they did not tell [Investigator Kizer] that he made any verbal threats toward them."

Investigator Kizer denied requesting a drug test on the [petitioner], even though, when he attempted to interview the [petitioner] on May 2, the [petitioner] "was talking very randomly." He also identified a report indicating that a shell casing was found in the victim's vehicle but denied having that casing or knowing where it was at the time of trial.

Dr. Thomas Deering, a medical examiner, testified as an expert in forensic medicine and medical pathology. He performed an autopsy on the victim and removed one bullet "in the right hip area" and a second bullet "in the lower left back." He explained that the first bullet entered through the front of the left shoulder and traveled across the body, left to right, down to the right hip area. In the course of its trajectory, the bullet

> went into [the victim's] chest cavity. It grazed the top of his
> left lung, and it actually went all the way through the bottom

13

of his left lung. . . . It goes through the diaphragm on that left side. It went through his stomach. . . . It hits that aorta and goes over and ends at . . . what's called the right pelvic retroperitoneal soft tissue.

Dr. Deering found, as a result of this wound, slightly less than one liter of blood in the chest cavity near the lung and that same amount in the victim's stomach. The other bullet entered the left shoulder area, struck a rib, and was found "in the left part of the back." He stated that this bullet never entered a major cavity of the victim's body. Dr. Deering stated that both of these wounds could have originated from "a weapon pointed down from above."

Dr. Deering also performed a toxicology test on the victim, and this test revealed that the victim had a blood alcohol level of .03 or .031. From this test, he also confirmed that the victim "probably smoked marijuana" sometime that evening. Dr. Deering determined that the manner of the victim's death was homicide caused by multiple gunshot wounds.

The State rested its proof. The [petitioner] chose not to testify, and the defense presented no proof.

Id. at *1-10.

On July 18, 2014, the petitioner filed a *pro se* petition for post-conviction relief and later an amended petition through counsel, alleging that he received ineffective assistance of counsel.

The post-conviction court conducted an evidentiary hearing, at which the petitioner's trial counsel testified that he could not recall anything he would have done differently in representing the petitioner. Counsel recalled not pursuing a defense of diminished capacity because he never observed a mental or psychological defect in the petitioner that would have supported a diminished capacity defense. He noted that the petitioner had given him an account of the incident as being self-defense. He recalled that the petitioner discussed with him that he had used drugs the night before and the day of the incident.

Counsel testified that the petitioner did not testify at trial but that the testimony from other witnesses supported their self-defense claim. He believed that the State's witnesses provided enough evidence to show that there was ongoing friction and anger between the victim and the petitioner and that the victim had initiated the incident. He

14

also thought there was sufficient evidence to infer that the victim had threatened the petitioner prior to the incident.

Counsel testified that, even though he believed that the State presented sufficient evidence for the case to go to the jury, the decision was made for the petitioner not to testify. He recalled that he and the petitioner discussed the issue "in detail, in depth, on several occasions," and based on the petitioner's criminal history and the petitioner's own belief that he would not make a good witness, they decided not to have the petitioner testify. Counsel elaborated that the petitioner believed he would not make a good witness because he might be easily angered or confused.

Counsel vaguely recalled that one of the jurors was a Department of Children's Services worker who had past interaction with the victim and his family, even serving as their case worker. However, counsel said that it was his normal procedure to use a peremptory challenge to strike any juror to whom a client objected, and the petitioner did not object to this juror. Counsel recalled no factual basis to challenge any potential juror for cause.

The petitioner testified that immediately prior to the shooting, he had taken a number of drugs and consumed alcohol, such that he was "messed up as a football bat [sic]." He claimed that he "would have r[u]n" had he not been under the influence. He recalled that he and the victim's sister had argued the morning of the incident, that the victim had called him, and that they had a heated discussion. He did not feel threatened in the initial conversation, but the victim was more hostile in subsequent phone calls which made him feel threatened. The petitioner knew the victim to be a very large man with a criminal record who owned a pistol.

The petitioner testified that in the moments immediately prior to his interaction with the victim the night of the shooting, he was at the home of Mandy Maness and Fletcher Howard. He heard the brakes on the victim's vehicle, went outside, and interacted with the victim when the victim stopped his car. The petitioner said that he pulled his gun when the victim began yelling at him through the window, while he told the victim to leave him alone. The petitioner said that he could have testified to these facts at trial but that counsel told him it would be in his best interest not to testify. He elaborated that counsel was "pretty confident in the facts that surrounded the case, that there was no need for [him] to testify." The petitioner thought he could have explained away his criminal record had he testified. The petitioner claimed that he would take the stand if granted a retrial, as he was the only one who could testify that he was fearful and acted in self-defense. He acknowledged that the trial court reviewed his right to testify with him and that he voluntarily made the decision not to testify.

The petitioner testified that "everybody that took the stand" verified that he was visibly intoxicated on the night of the incident. He recalled that he had consumed an unusual amount of intoxicants, mostly Xanax. He claimed that he lacked the ability to control his actions that night. The petitioner admitted that he took the drugs voluntarily, and that the State's witnesses "did a pretty good job of testifying to [his] mental state."

The petitioner testified that he raised the issue of the victim's social worker being on the jury with counsel. He admitted that the social worker made the trial court aware of her knowledge of the victim and his family but told the court it would not affect the way she would try the case, and the court allowed her to remain on the jury. The petitioner claimed that counsel rationalized the decision to leave her on the jury by saying that she "would be able to prove what kind of piece of shit that [the victim] was[.]" He said that he trusted counsel's judgment.

Following the conclusion of the proof, the post-conviction court made oral findings, followed by a written order, denying relief. In its oral findings, the court accredited counsel's testimony that there were no factual issues that would have justified raising a defense of diminished capacity. The court noted that the petitioner testified that he thought the State's witnesses did a good job of presenting any diminished capacity or mental issues he may have had at the time. The court found that, even though the petitioner did not testify, the other testimony fairly raised the issue of self-defense such that the court included it in its charge to the jury based on this determination.

The court continued in its oral findings, determining that the petitioner's not testifying was a strategic decision. The court noted it had conducted a colloquy with the petitioner about testifying, and the petitioner knowingly decided not to do so. The court found no clear and convincing evidence that the petitioner would have testified. The court found no proof that the juror who was acquainted with the victim was influenced by anything other than the evidence and the law. The court noted that counsel testified that the petitioner raised no issue regarding the juror. The court concluded that counsel's performance did not fall below professional standards and that there was no reasonable probability that the outcome would have been different under any circumstances.

In its written order, the court noted that the decision not to call the petitioner as a witness was a joint decision of him and counsel, and the court questioned the petitioner regarding his decision. The court found that the petitioner made a knowing and intelligent decision based on strategy, and that the jury received an instruction on self-defense regardless of the petitioner's not testifying. With regard to the juror issue, the court found that counsel consulted with the petitioner during voir dire and that any decisions that were made were based on trial strategy. The court also determined that there was no evidence of any bias of any juror.

## ANALYSIS

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, our review of a post-conviction court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's

unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The petitioner argues that counsel provided ineffective assistance because he failed to have him testify at trial, especially considering that counsel believed the State had met its burden of proof. As to this issue, the post-conviction court found that the petitioner's not testifying was a strategic decision made by the petitioner and counsel. The evidence indicates that the decision was based on the petitioner's having a criminal record and the petitioner's own belief that he would not make a good witness, as well as the fact that there were other witnesses who could help make their self-defense claim. Additionally, the post-conviction court found, and it was admitted by the petitioner, that the trial court questioned the petitioner about testifying, and he knowingly and voluntarily made the decision not to do so. The petitioner has failed to show that counsel performed deficiently.

The petitioner also argues that counsel provided ineffective assistance because he failed to strike a juror from the panel who was acquainted with the victim and his family. Counsel testified that it was his procedure to use a peremptory challenge to strike any juror to whom a client objected, and the petitioner raised no objection. The petitioner himself testified that counsel's rational for not striking the juror was because the juror would also be familiar with the unsavory aspects of the victim's character. The court found that counsel consulted with the petitioner during voir dire and that any decisions that were made were based on trial strategy. The court additionally found that there was no proof that the juror in question was influenced by anything other than the evidence and the law. The petitioner has failed to prove that counsel performed deficiently or that any deficiency caused him prejudice.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE

18